UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

SHERWOOD BRANDS, INC.          :
                               :
         v.                    :       C.A. No. 08-051ML
                               :
PENNSYLVANIA MANUFACTURERS'    :
ASSOCIATION INSURANCE CO.      :

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

Before the Court for a report and recommendation (28 U.S.C. § 636(b)(1)(B); LR Cv 72) is Defendant's Motion for Summary Judgment. (Document No. 47). Plaintiff opposes the Motion. (Document No. 55). Neither side has requested oral argument on this Motion (LR Cv 7(e)), and the Court does not find it necessary in view of the parties' thorough briefing.

**Background**

Plaintiff, Sherwood Brands, Inc., ("Sherwood") formerly occupied an old, four-story mill building in New Bedford (the "Premises") and utilized the Premises as a warehouse. Defendant, Pennsylvania Manufacturers' Association Insurance Company ("PMAI"), insured the Premises but not its contents under Policy Number 820500-76-39-06-5 for the period October 3, 2005 to October 3, 2006. (Document No. 1-1 at ¶¶ 3, 4).

Sherwood commenced this action in Providence County Superior Court in early 2008. It was removed to this Court by PMAI on diversity grounds on February 15, 2008. Sherwood alleges that the Premises was damaged by wind and rain during a storm occurring on or about November 11, 2005 and, in particular, that high winds caused a catastrophic roof lift which

damaged the roof and allowed water to get under the roof membrane and then into the Premises causing further damage. Id. ¶ 5. PMAI denied coverage on the grounds that the claimed damage resulted from the failure of the roof through normal wear and tear which is excluded from coverage. Id. ¶ 7.

In its Motion, PMAI contends that it is entitled to summary judgment because Sherwood did not have any "insurable interest" in the Premises at the time. Alternatively, PMAI argues that, even if Sherwood had an insurable interest and the storm damage in issue was a covered loss, PMAI is entitled to partial summary judgment limiting Sherwood's recovery due to its failures (1) to repair or replace the roof; and (2) to mitigate its damages. Sherwood counters that it had an "insurable interest" in the Premises arising out of a lease/purchase agreement (the "Lease") with the New Bedford Redevelopment Authority ("NBRA"). In addition, Sherwood denies that it failed to mitigate its damages and asserts that the particular amount of its damages remains a triable issue of fact.

The following undisputed facts are gleaned from the parties' Local Rule 56 Fact Statements. (Document Nos. 48, 56, 57 and 62). Sherwood occupied the Premises under a Lease with the NBRA dated May 31, 2000.[1] (Document No. 56-1). The Lease (Sections 2.1 and 2.4) is for a primary term of twenty (20) years with an initial rent payment of $400,000.00 and subsequent installments of "additional rent" totaling $800,000.00. The Lease (Section 2.5) also granted Sherwood the option to purchase the Premises at any time during the primary term for

---

[1] PMAI's submissions contain a reference to a signed and recorded "Memorandum of Lease" dated September 9, 2005 but neither side provides a copy of this subsequent lease or any explanation as to the terms of such lease. (See Document No. 48-3 at ¶ (b)).

$1,200,000.00 less any rent paid. Sherwood was additionally obligated under the Lease (Section 41.2) to invest $700,000.00 in renovations of the Premises and $500,000.00 in equipment and machinery to be utilized at the Premises. The Lease (Sections 9.2 and 10.1) further obligated Sherwood to maintain and repair the Premises and obtain a hazard insurance policy on the Premises. Finally, the Lease (Section 41.1) required Sherwood to employ a minimum number of full-time employees at the Premises.

After the loss in dispute, Sherwood became involved in litigation in 2007 regarding the Premises which involved both the NBRA and the City of New Bedford. Sherwood initiated arbitration against the NBRA pursuant to Section 38.1 of the Lease regarding the issue of responsibility for real estate taxes on the Premises. It appears that the City was seeking payment for real estate taxes on the Premises, the NBRA took the position that Sherwood was responsible for payment and Sherwood claimed the NBRA had agreed to accept the rent payments under the Lease in lieu of real estate taxes. NBRA counterclaimed alleging, in part, that the Lease with Sherwood was "null and void" because it lacked the legal authority to purchase and lease the Premises, i.e., the action was "*ultra vires*." The NBRA also alleged that Sherwood had defaulted on its obligations under the Lease in several respects. Sherwood denied all of the NBRA's claims of default but agreed that the Lease was "null and void due to *ultra vires*" and sought a declaration from the arbitrator that the Lease was "null and void, *ab initio*." Additionally, the NBRA commenced a Massachusetts state court action in Bristol County Superior Court and unsuccessfully sought to stay the Sherwood arbitration based on the parties' "agreement" in the arbitration pleadings that the Lease containing the arbitration provision was null and void, *ab*

*initio*. The Court refused to stay the arbitration, holding that "[t]he mere fact that the lease purchase agreement <u>may be unenforceable</u> due to the failure to comply with [Mass.] G.L. c. 30B[2] does not render the arbitration clause invalid." (Document No. 48-5 at p. 7) (emphasis added).

Sherwood vacated the Premises in early 2009. In an Agreement dated September 8, 2009, Sherwood settled its pending litigation involving the NBRA and the City of New Bedford. (Document No. 57-1). The Agreement required Sherwood to pay $200,000.00 to NBRA which the NBRA was to forward to the City towards the outstanding real estate taxes and provided that the NBRA and the City "shall be solely responsible for working out payment of the real estate tax balance." Id. The Agreement also provided that the "NBRA shall assign to Sherwood any interest it might have in the proceeds of Sherwood's insurance claim regarding the roof." Although the Agreement is signed by representatives of Sherwood, the NBRA and the City, it provides that "settlement documents shall be completed forthwith." However, neither party has presented any additional "settlement documents" to the Court.

**Standard of Review**

When ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. Cont'l Cas. Co. v, Canadian Univ. Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991). Once this is done, Rule 56(c) requires that summary judgment be granted if there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law. A material fact is one affecting

---

[2] Mass. Gen. Laws ch. 30B, §§ 1 et seq., is the Massachusetts Uniform Procurement Act which establishes notice and bidding procedures for certain agreements with public entities. In its decision denying the NBRA's request to stay arbitration, the Superior Court noted that the "NBRA did not conduct a competitive proposal process" for the Premises lease and it did not "appear" that the property fell within a potential exemption for urban renewal projects. (Document No. 48-5 at p. 3, n.2).

the lawsuit's outcome. URI Cogeneration Partners, L.P. v. Bd. of Governors for Higher Educ., 915 F. Supp. 1267, 1279 (D.R.I. 1996). Factual disputes are genuine when, based on the evidence presented, a reasonable trier of fact could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To win summary judgment on a particular count of the complaint, the moving party must show that "there is an absence of evidence to support" the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In response, the nonmoving party cannot rest on its pleadings, but must "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion. Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988).

In this District, Local Rule ("LR") Cv 56 requires that a Motion for Summary Judgment be accompanied by a Statement of Undisputed Facts, with each fact set forth in a numbered paragraph. The moving party's proffered Facts are deemed admitted unless the objecting party files a Statement of Disputed Facts, identifying the evidence establishing the dispute. See LR Cv 56(a)(3). In the present litigation, PMAI filed a Statement of Undisputed Facts. (Document No. 48). Sherwood followed with a Statement of Disputed Facts and its own Statement of Undisputed Facts (Document Nos. 56 and 57), numbered consecutively to PMAI's Facts, as required by LR Cv 56(a)(4). PMAI responded to Sherwood's filing with a Statement of Disputed Facts with corresponding numbering as required by LR Cv 56(a)(5). (Document No. 62).

**Discussion**

### A. Insurable Interest

"In order for recovery on an insurance policy to be had, it is essential that the claimant show both an existing contract of insurance and an insurable interest in the property." Focus Inv. Assocs., Inc. v. Am. Title Ins. Co., 992 F.2d 1231, 1241 (1st Cir. 1993) (citations omitted). Although the insurable interest doctrine "may at first glance appear unfair to policyholders" who have actually paid premiums, it is intended (1) to prevent gambling through insurance policies; (2) to prevent rewarding and thereby tempting the destruction of property; and (3) to confine insurance contracts to indemnity. New Ponce Shopping Ctr., S.E. v. Integrand Assurance Co., 86 F.3d 265, 268 (1st Cir. 1996). See also Dwight v. Norfolk and Dedham Mut. Fire Ins. Co., C.A. No. 81-4577, 1986 WL 714429 at *3 (R.I. Super. Oct. 21, 1986) ("It is well established that an individual cannot insure the property of another for his own benefit; a property in which he has no interest."). "Title is not the touchstone of an insurable interest." Queen v. Vermont Mut. Ins. Co., 589 N.E.2d 325, 327 (Mass. App. Ct. 1992). "Persons have an insurable interest if they receive a benefit from that property or will suffer a loss by reason of its destruction." Id. See also Sullivan v. Amica Mut. Ins. Co., C.A. No. 76-2790, 1976 WL 177165 at *1 (R.I. Super. Oct. 20, 1976) ("An insurable interest exists when the insured derives pecuniary benefit or advantage by the preservation or continued existence of the property or will suffer pecuniary loss from its destruction."); and Couch on Insurance, 3d ed. at § 41:1 ("Insurable interest may be defined as any lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage.").

PMAI's argument narrowly focuses on the Lease. It argues that Sherwood had no insurable interest in the Premises because the Lease, by Sherwood's own admission, was void *ab initio* due to the fact that the NBRA did not have the power to confer any rights to Sherwood. Sherwood agrees with PMAI that it must have an insurable interest in the Premises in order to recover on the policy. However, it has a broader view than PMAI and argues that it had an insurable interest "based on its agreement to purchase with the NBRA and its continuing tenancy in the building." (Document No. 55 at p. 2). Sherwood also contends that "NBRA has assigned to Sherwood its interest in this roof litigation, placing Sherwood in the position of holding its own insurance interest through the purchase lease, tenancy, and duty to repair, as well as any interest the NBRA may have in this action." Id. at pp. 3-4.

The parties' competing arguments raise the issue of whether an insurable interest may be predicated on a void or unenforceable lease. First, there is nothing in the record indicating that a Court or arbitrator ever declared the Lease to be void or unenforceable. Rather, it appears that the NBRA took the position by way of a counterclaim in the arbitration commenced by Sherwood that the Lease was "null and void" due to "*ultra vires*" (Document No. 48-3) and Sherwood "accepted" that position and counter-counterclaimed seeking a declaration that the Lease was "null and void, *ab initio*." (Document No. 48-4). In its Statement of Undisputed Facts, PMAI asserts that "[t]he NBRA and the City determined that the [Lease] entered into with Sherwood was *void ab initio*" and that Sherwood "admits and acknowledges" that fact. (Document No. 48, ¶¶ 4-6). In its counter-statement (Document No. 56), Sherwood does not

contest these assertions and thus they are "deemed admitted" for purposes of this Motion. See LR Cv 56(a)(3).

PMAI relies primarily on the First Circuit's decision in Focus Inv. Assocs., Inc. v. Am. Title Ins. co., 992 F.2d 1231 (1st Cir. 1993). In Focus, an insured mortgagee brought suit against a title insurer alleging failure to properly search title and disclose title defects to the insured. The title insurer defended, in part, by arguing that the insured mortgagee did not have any insurable interest because the underlying mortgage was usurious and thus illegal under applicable state law. The First Circuit agreed and held that if the loan was in fact usurious, then, as a matter of law, the insured mortgagee would have no interest in the collateral mortgages. Id. at 1243. Relying upon Phalen Park State Bank v. Reeves, 251 N.W.2d 135, 138-139 (Minn. 1997), the First Circuit reasoned that because a usurious mortgage is void, the mortgagee has no right to collect principal or interest and suffers no loss if the mortgaged property is destroyed. Focus Inv. Assoc., 992 F.2d at 1242. It also recognized that finding an insurable interest under such circumstances would conflict with the strong public policy against usurious transactions. Id.

Neither Focus nor Phalen directly support PMAI's argument. In the case of a usurious mortgage, the insured mortgagee "has no right to collect principal or interest, [and thus] no loss will occur [to it] if the [mortgaged] property is destroyed." Id. Also, the usurious mortgagee has unclean hands as a result of its own illegal behavior. Here, by contrast, Sherwood was occupying the Premises pursuant to the Lease both at the time the PMAI policy was issued and the loss in dispute occurred – a Lease which obligated Sherwood to insure the Premises and gave it an option to purchase. The issue of the validity of the Lease did not arise until approximately

two years after the loss in dispute and in the context of a dispute as to real estate tax liability. As previously noted, there is no indication in the record that the Lease was ever actually declared void or unenforceable by a Court or arbitrator but rather that the parties "agreed" in pleadings that the Lease was null and void *ab initio* due to *ultra vires*, i.e., because the NBRA lacked legal authority to purchase the Premises and enter into the Lease. Unlike the usurious insureds in Focus and Phalen, there is no indication of any wrongdoing by Sherwood in connection with the Lease, and it continued to occupy the Premises until 2009.

PMAI's argument must be examined in the context of the underlying purposes of the insurable interest doctrine. Delk v. Markel Am. Ins. Co., 81 P.3d 629, 637 (Ok. 2003) ("The purpose of the insurable interest requirement must stand at the center of any analysis of the doctrine's application."). "The insurable interest requirement should not be extended beyond the reasons for its existence by an overly technical construction that frustrates the legitimate expectations of the insured or that permits an insurer to avoid the very risk it intended to insure." Id. The first purpose of the insurable interest requirement is to prevent gambling on losses through the acquisition of insurance policies. There is no indication that Sherwood obtained the PMAI policy in bad faith or for speculative purposes and thus this purpose is not implicated. In fact, the Lease (Section 10.0) required Sherwood to obtain a hazard insurance policy on the Premises consistent with the common business practice in commercial leases of passing insurance premium costs to tenants. The second purpose is to eliminate the potential of rewarding and thereby incentivizing the destruction of or failure to safeguard property. This purpose is also not implicated. There is no suggestion that Sherwood was involved in creating

the loss (a roof failure). In addition, Sherwood was occupying the Premises at the time and using it as a warehouse under a purported lease/purchase arrangement. Thus, there is no rational basis upon which to suspect any temptation by Sherwood to cause or allow the loss.

The final purpose is to confine insurance contracts to indemnity for losses actually sustained and preclude windfall recoveries. This purpose is implicated as PMAI argues that any payment to Sherwood would constitute a windfall since it no longer occupies or has any interest in the Premises, and it never repaired or replaced the roof. Sherwood counters that recovery under the policy would not be a windfall since it was sued by the NBRA due in part to the roof damage in dispute and took an assignment of NBRA's rights to the insurance proceeds as part of a settlement.

As to loss payment, the PMAI policy provides that in the event of a covered loss, PMAI has the following options:

    (1)    pay the value of lost or damaged property;

    (2)    pay the cost of repairing or replacing the lost or damaged property;

    (3)    take all or any part of the property at an agreed or appraised value; or

    (4)    repair, rebuild or replace the property with other property of like kind and quality.

(Document No. 48-24). The policy indicates that the insurer will notify the insured as to its intentions within thirty days after receipt of sworn proof of loss. Id. Since PMAI denied coverage under the wear and tear exclusion, the loss payment clause was not triggered. However, it further provides that the insurer will not pay the insured "more than your financial interest in the Covered Property." Id. Additionally, it provides that the insurer "may adjust

losses with the owners of lost or damaged property if other than you" but "will not pay the owners more than their financial interest in the Covered Property;" and "may elect to defend [the insured] against suits arising from claims of owners of property" at its expense. Id. Finally, as to Replacement Cost coverage, the policy provides that payment is conditioned on actual repair or replacement and doing so "as soon as reasonably possible after the loss or damage." (Document No. 48-25).

Because the parties to the Lease "agreed" that it was void *ab initio*, PMAI argues that Sherwood has no insurable interest and, even if the loss was a covered event, is not entitled to any recovery. Sherwood counters that it has an insurable interest and is entitled to full recovery; and that "[i]n view of Sherwood's loss of the entire building and the NBRA's claims for damages, the repair costs to the building from the storm damage are a conservative measure of the actual damages sustained by Sherwood from the storm damage." (Document No. 55 at p. 8).

After reviewing the parties' briefs and exhibits, the Court concludes that PMAI has not presently established that Sherwood lacks an insurable interest as a matter of law. Although many of the facts relied upon by PMAI are undisputed, those facts do not tell the entire story. While the Court agrees that Sherwood is not entitled to a windfall simply because it occupied the Premises for a period under a void lease, the underlying transaction and Sherwood's financial interest (legal or equitable) is more complicated. The PMAI policy by its plain and unambiguous terms limits loss payment to the insured's "financial interest in the Covered Property." (Document No. 48-24). Thus, the question is whether Sherwood had a financial interest in the

Premises and, if so, the amount of such interest. Because PMAI has not established the absence of genuine issues of material fact as to the loss actually suffered by Sherwood, it has not shown an entitlement to summary judgment on the grounds of lack of insurable interest. The record is incomplete as to the extent of Sherwood's "investment" in the Premises under the Lease in terms of rent, renovations, maintenance and capital improvements and its liability to the owner for damages to the Premises.

Also, other than a handful of documents, the record is incomplete as to the claims made in the litigation between Sherwood, the NBRA and the City. In his deposition, Sherwood's President, Mr. Frydman, testified that Sherwood took the position in the NBRA arbitration that it was "not responsible for the claim of the roof" in response to the NBRA's claim that Sherwood "owed money for the cost to repair or replace the roof on [the Premises]." (Document Nos. 48-2 at pp. 6-7 and 56-2 at p. 3). However, there is nothing in the record regarding the legal or factual bases for these competing positions.[3] In addition, as to outcome, it appears that the Lease dispute was settled in 2009, (Document No. 57-1 at p. 2), but it is impossible on this record to sort out if the claim for roof damage was in any way material to the settlement. Although the Agreement speaks to the completion of further "settlement documents," they are not part of the record. It is also apparent that the roof issue was part of the negotiation since the Agreement provides that the "NBRA shall assign to Sherwood any interest it might have in the proceeds of Sherwood's insurance claim regarding the roof" as part of the deal. (Document No. 57-1 at p. 2). It is

---

[3] The Court assumes that the NBRA's position arose out of Section 9.2 of the Lease (Maintenance and Repair). It provides that the Lessee, Sherwood, "shall in a reasonable and prudent manner maintain, repair, replace and paint all or any part of the Leased Premises and improvements on the Leased Premises...any of which may be damaged or destroyed by use, the elements, wear, weather, deterioration or the acts or omissions of the Lessee...."

unclear, however, if the Agreement itself constituted the assignment or if some other written assignment was contemplated. Furthermore, the legal relevance of the assignment is unclear, as the record does not identify the NBRA as an additional named insured under the policy in issue, and Sherwood does not identify any other legal theories which might give the NBRA any legal or equitable interest in such insurance proceeds which could be assigned. Although the parties' submissions imply that the Premises were owned by the NBRA at the relevant time, the NBRA claimed in arbitration that the Lease was null and void because its actions "in buying said property <u>and</u> leasing the same to Sherwood...was *ultra vires*." (Document No. 48-3) (emphasis added). Sherwood "accepted" the NBRA's claim in a responsive pleading. (Document No. 48-4). Thus, the record is not clear as to the actual lawful owner of the property at the time of the claimed loss. Finally, the Agreement provided for a payment of $200,000.00 from Sherwood to the NBRA, but there is no indication in the record as to the actual consideration for such payment or even if the payment was actually made by Sherwood.

The facts in this case are unusual and thus it is not surprising that neither side has cited any case law directly on point. In <u>Couch on Insurance</u>, 3d, § 41:4 (Insurable Interest Based on Void or Voidable Contract), it is noted that although there is a conflict in the case law as to whether an insurable interest may be based on a void or voidable contract, the conflict "is more apparent than real." In particular, it is noted that "the courts do not pay too much attention to the validity or enforceability of the contract upon which the insurable interest is predicated" but rather, "the courts' primary motivation appears to be concern that the insured not be liable for

the loss should the subject matter of the insurance contract be damaged or destroyed by the peril insured against." Id. It further explains that:

> When a sale of property is made by one who is neither the owner of the property nor possesses authority to sell it, the vendee does not acquire any title as against the true owner and therefore does not have an insurable interest. There is authority, however, that when property is delivered into the possession of a third person by the unauthorized act of an agent or purported owner, the possessor may still have an insurable interest although he or she has no right to possession. The theory here followed is that as he or she is accountable to the true owner for the restoration of the property he or she will suffer pecuniary loss if the property is damaged.

Id.[4] This commentary is consistent with the fundamental principle that "[t]he proceeds of an insurance contract are an indemnity for the loss actually sustained by the insured." Russo v. Hingham Mut. Fire Ins. Co., 2001 Mass. App. Div. 17, 2001 WL 113992 at *3 (Mass. App. Div. Feb. 5, 2001) (citation omitted). See also Beatty v. USAA Cas. Ins. Co., 954 S.W.2d 250, 254 (Ark. 1997) ("In order to have an insurable interest, a party does not have to have legal title to the property insured, but some legal basis for the assertion of interest. This legal interest can be based upon (1) factual expectation of damages, (b) property interests, (c) legal liability, (d) and contract right.") (citation omitted).

In Morgan v. Patrons Mut. Ins. Ass'n, 813 F. Supp. 1502 (D. Kan. 1993), the Court rejected an insurer's defense of lack of insurable interest arising out of an oral contract to purchase a bowling alley which was destroyed by fire. Although it was undisputed that the sales contract was unenforceable under the statute of frauds, the Court found an "equitable" insurable

---

[4] In Couch on Insurance, 3d, § 42:53 (Tenants at Will or Sufferance), it is also noted that one granted tenancy on condition of keeping the property in repair and obtaining insurance has an insurable interest "coextensive with his or her liability" to the owner.

interest because the insureds had possessed and operated the bowling alley for several months with the consent of the true owners and had expended funds to improve the facility. Id. at 1505-1507. In addition, the Court noted the absence of any evidence of any fraudulent intent on the insureds' part. Id. The Court, however, also rejected the insureds' summary judgment claim for the entire value of the insurance policy (even though the bowling alley was completely destroyed and it was undisputed that the total value of the loss exceeded the policy limits) and left the issue of the exact measure of potential recovery arising out of such insurable interest open for further proceedings. Id. at 1507. See also Chicago Title & Trust Co. v. United States Fid. & Guar. Co., 511 F.2d 241, 247 (7th Cir. 1975) (recognizing that the insurable interest requirement need not act as a complete bar to recovery but may "limit the amount of damages to correspond to the insured's limited interest"); and Gossett v. Farmers Ins. Co. of Washington, 948 P.2d 1264, 1273-1274 (Wash. 1997) (recognizing that "under the principle of indemnity.., an insured with a partial interest in the property can generally recover only to the extent of that interest" and holding that intended future purchasers of house destroyed in fire had insurable interest limited to value of improvements they made to house and not for replacement value of entire house).

Here, PMAI has simply not established the lack of an insurable interest as a matter of law and thus it is not entitled to summary judgment under Fed. R. Civ. P. 56. PMAI relies exclusively on the fact that Sherwood and the NBRA "agreed" in litigation that their Lease was void *ab initio*. However, as outlined above, the issue is much more complicated than presented by PMAI and, although Sherwood no longer occupies the Premises and apparently has no present legal interest in the Premises as Lessee or otherwise, there remain factual issues as to the

presence of an insurable interest and the extent of that interest. Further, such interest must be examined and delineated in the context of the fundamental purpose of indemnity underlying insurance contracts and Sherwood's actual covered losses, if any, arising out of the claimed roof damage.

**B.     Damages**

Alternatively, PMAI argues that it is entitled to partial summary judgment as to damages. First, PMAI asserts that Sherwood never repaired or replaced the damaged roof and thus its recovery is limited to the actual cash value of the roof damage and not replacement cost. Second, PMAI contends that Sherwood failed to mitigate its damages by failing to accept a roofer's proposal (Document No. 48-15) in early 2006 to replace the entire roof for $112,000.00 (with "extra" "for permit to install roof" and for "repair of rotten [roof] deck") and thus its potential damages must be capped at that amount.

The parties' competing arguments as to damages are rife with factual disputes and inappropriately call upon the Court to weigh and interpret expert opinions. In addition, as discussed above, the Court has already concluded that factual issues remain as to whether Sherwood had an insurable interest in the Premises and, if so, the extent of such interest. A thorough review of the parties' arguments and extensive evidentiary submissions plainly reveals that triable issues of material fact remain with regard to liability, damages and mitigation. Again, PMAI has simply not established an entitlement to partial summary judgment as to the scope of potential damages.

**Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgment (Document No. 47) is DENIED. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia- Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


 /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
December 7, 2010